van Gestel, J.
These three consolidated cases are before the Court on two motions for summary judgment filed by each of the plaintiffs in the first two cases captioned above (Nos. 03-0547 BLS and 03-0554 BLS). The motions seek relief in each of the three pending cases.
BACKGROUND
The underlying complaints in cases Nos. 03-0547 BLS and 03-0554 BLS seek declaratoiy relief regarding the propriety of the implementation by the corporate defendant Central Bancorp, Inc. (“Central Bancorp”) of the provisions of a certain Shareholder Rights Agreement (“SRA”), referred to generally as a “Poison Pill.” The plaintiffs in those cases, along with certain others, were designated as an “Acquiring Person” or as an “Adverse Person” under the Shareholder Rights Agreement and thereby possibly could suffer a dilution of their shareholder interests in Central Bancorp.
The complaint in case No. 03-0547 BLS (hereafter the “Seidman Claim”) was filed on January 30, 2003. At that time, ex parte, the plaintiffs received a temporary restraining order (“TRO”) from the Emergency Judge then on duty, thus keeping matters in status quo until both sides could have an opportunity to be heard without the occurrence of any irreparable action such as that threatened by the defendants.[7]
The complaint in case No. 03-0554 BLS (hereafter the “PL Capital Claim”) was filed the next day, on January 31, 2003. This Court directed that the temporary relief sought in this second case be heard along with the various forms of relief requested in the first case.
On January 31, 2003, the defendants in the Seid-man Claim filed a motion to dismiss that case and vacate the temporary restraining order. This Court scheduled a hearing on that motion for the same time as the hearing on the return of the order of notice on the TRO. The Court also considered the essence of the motion to dismiss to apply to the PL Capital Claim as well.
The basis for the motion to dismiss was the filing on January 28, 2003, by the members of a “Special Committee” of the Board of Directors of Central Bancorp, of an action in the United States District Court for the District of Massachusetts captioned Nancy D. Neri et al. v. PL Capital, LLC et al., Civil Action No. 03-10179-EFH (the “Federal Action”). All of the plaintiffs, except one, in both actions here were named among the defendants in the Federal Action.[8]
*384 The complaint in the Seidman Claim is in one count seeking a declaratory judgment and related relief determining “whether, under Mass. [G.L.]c. 156B, Sec. 65, the determination by Central Bancoip’s ‘Special Committee’ made on January 24, 2003 was made in good faith and in a manner reasonably believed to be in the best interests of the corporation, with the exercise of such care as an ordinarily prudent person in a like position would use under similar circumstances.” Complaint, para. 38.
The complaint as originally filed in the Federal Action[9] also was in just one count, seeking a declaration that “under Mass.Gen.L.ch. 156B, Sec. 65, the Board’s determinations concerning the defendants were made in good faith and in a manner reasonably believed to be in the best interests of the corporation, with the exercise of such care as an ordinarily prudent person in a like position would use under similar circumstances.” Federal Complaint, para. 44.
The Federal Action and the Seidman Claim sought essentially identical declaratory relief regarding the same actions by the Special Committee of the Central Bancorp Board and the Board itself considering the same stock acquisitions, but, of course, leading to quite different results.
The complaint in the PL Capital Claim relates to the same situation also, but seeks injunctive relief as well as a declaration that the plaintiffs there are not an “Acquiring Person” or an “Adverse Person.”
This Court, in deference to the case first filed in the Federal Court, stayed all activity in the two cases then before it, pending action in the Federal Court.
Recently, this Court was advised that Judge Harrington has stayed the Federal Action, pending a resolution by this Court of Massachusetts state law issues that predominate and which are said to be matters of first impression.
All parties agreed that the stay previously issued in the Seidman Claim and the PL Capital Claim be lifted.
Further, all parties agreed that the third case captioned above, case No. 03-2287 BLS (hereafter the “Central Bancorp Claim”), be consolidated for all purposes with the previously consolidated Seidman Claim and PL Capital Claim. The complaint in the Central Bancorp Claim is also in a single count seeking declaratory relief to the effect that the actions of the Central Bancorp Board of Directors and its Special Committee were consistent with G.L.c. 156B, Sec. 65. Complaint, paras. 133-34.
Still further, all parties agreed that all discovery conducted to date in the Federal Action may be used in these three consolidated Superior Court cases as if taken therein. The parties also reserved their rights to conduct further discovery, if appropriate.
All parties urged upon this Court its prompt attention to two issues that they say will significantly assist in the further litigation of these cases. Indeed, the plaintiffs in the original two cases suggest that the Court’s action on these issues should be dispositive of all three cases. The two issues are: (1) an argument that the matters in issue have become moot by recent actions taken by some of the parties with regard to their disposition of certain Central Bancorp stock; and (2) questions regarding the standard of review to be applied, and the application of that standard, to the actions of the Special Committee and the Board of Central Bancorp that precipitated these actions.
Central Bancorp is a Massachusetts publicly traded, registered bank holding company. At issue is the Shareholder Rights Agreement, dated as of October 11, 2001, as amended, by and between Central Bancorp and EquiServe Trust Company, N.A. as Rights Agent. The SRA is said “to provide the stockholders of Central Bancorp, Inc. (the ‘Company’) the opportunity to benefit from the long-term prospects and value of the Company and to ensure that stockholders of the Company receive fair and equal treatment in the event of any proposed takeover of the Company.”
The SRA includes certain provisions, some of which are material, as follows:
“Acquiring Person” shall mean any Person who is a Beneficial Owner of 10% or more of the outstanding shares of Common Stock [with certain exceptions not here material]. . .
“Adverse Person” shall mean a Person declared as such by the Board of Directors of the Company, upon (i) a determination that such Person, alone or together with its Affiliates and Associates, has become the Beneficial Owner of 10% or more of the outstanding shares of Common Stock and (ii) a determination by the Board of Directors, including at least a majority of the Disinterested Directors, after reasonable inquiry and investigation . . . that (A) such Beneficial Ownership by such Person is intended to cause, is reasonably likely to cause or will cause the Company to repurchase the Common Stock beneficially owned by such Person or to cause pressure on the Company to take action or enter into a transaction or series of transactions which would provide such Person with short-term financial gain under circumstances where the Board of Directors determines that the best long-term interests of the Company and its stockholders, but for the actions and possible actions of such Person, would not be served by taking such action or entering into such transactions or series of such transactions at that time or (B) such Beneficial Ownership is having or is reasonably likely to have a material adverse impact... on the business or prospects of the Company . . .
A Person shall be deemed the “Beneficial Owner,” and to have “Beneficial Ownership,” of and to “Beneficially Own”... any securities which such Person or any of such Person’s Affiliates or Associates beneficially owns, directly or indirectly, for purposes of Section 13(d) of the Exchange Act or Rules *385 13d-3 and 13d-5 promulgated thereunder ... in each case as in effect on the date hereof. . .
“Distribution Date” shall mean (i) the first date of public announcement by the Company (by any means) or by an Acquiring Person (by means of filing a Schedule 13D under the Exchange Act or any comparable successor report or schedule or amendment thereto) that an Acquiring Person has become such or (ii) the first date of public announcement by the Company (by any means) that an Adverse Person has become such.
It is recited in the SRA that Central Bancorp’s Board of Directors has authorized and declared a dividend of one Right in respect of each share of Common Stock held as of record as of the close of business on October 24, 2001, and authorized the issuance of one Right in respect of each share of Common Stock issued after that date and prior to the earlier of the Separation Time or the Expiration Time as defined in the SRA.
Article III of the SRA, in Sections 3.1(a) and (b), provides for adjustments to “Rights” in the event of certain transactions.
3.1 Distribution Date, (a) In the event that prior to the Expiration Time a Distribution Date shall occur, then, if applicable law does not preclude Rights owned by certain Persons referred to in Section 3.1(b) hereof to become void pursuant to the provisions hereof, the Company shall take such action as shall be necessary to ensure and provide that, except as provided below, each Right shall constitute the right to purchase from the Company . .. that number of shares of Common Stock... [as thereafter definedl.. .
(b) Notwithstanding the foregoing, to the extent permitted by applicable law, any Rights that are or were Beneficially Owned on or after the Distribution Date by an Acquiring Person, an Adverse Person, or an Affiliate or Associate thereof or by a transferee, direct or indirect, of any of the foregoing shall become void and any holder of such Rights (including transferees) shall thereafter have no rights to exercise or transfer such Rights. For purposes of the preceding sentence, a transferee of an Acquiring Person, Adverse Person or Affiliate or Associate thereof shall include only a person who (i) becomes a transferee after the Acquiring Person, Adverse Person becomes such or (ii) becomes a transferee prior to or concurrently with the Acquiring Person or Adverse Person becoming such and receives such Rights [under certain specified conditions] . . .
The SRA is recited to be “a contract made under the laws of the Commonwealth of Massachusetts and for all purposes shall be governed by and construed in accordance with the laws of the Commonwealth.”
A Special Committee of Independent Directors of Central Bancorp, after an investigation, made a report and recommendation to the full Board of Directors on January 22, 2003, that PL Capital and its affiliates were an “Acquiring Person” under the SRA because they had acted in concert to acquire over 10% of Central Bancorp’s common stock without board approval. The affiliates include the other plaintiffs in the PL Capital Claim, as well as all of the plaintiffs in the Seidman Claim. For purposes of addressing the present motions only, the Court will assume the correctness of the Special Committee’s determinations.
The Central Bancorp full Board of Directors, on January 28, 2003, adopted the report and recommendation of the Special Committee, and this and the Federal litigation followed almost immediately.
Central Bancorp’s Board ofDirectors, at all material times, including the present, consisted of eight members, of whom five — Paul Bulman, Nancy Neri, Gregory Boulos, Richard Fates and Garrett Goodbody[10] — have no financial or employment relationship with Central Bancorp beyond their service on the Board. The Special Committee, at all times, has consisted of Ms. Neri and Messrs. Boulos and Bulman.
On February 11, 2003, Central Bancorp purported to amend the SRA to include the following provision:
Notwithstanding any other provision hereof, no public announcement or statement made by the Company (by any means) regarding the determination of the Board of Directors made on January 28, 2003, that the PL Capital-Stilwell-Seidman-Reichenbach Group constitutes an Acquiring Person shall be deemed to constitute a Distribution Date or in any other way trigger or attempt to trigger this Agreement prior to such time as no court order precludes announcement of a Distribution Date or other triggering of this Agreement.
Then, between May 8 and 12, 2003, certain of the parties said by the Special Committee to be included within the Acquiring Person group — the Seidman parties — claim to have sold all of their shares of Central Bancorp on the open market.[11] As a result, from the time of those sales to date, the alleged Acquiring Person group has held, and now holds, fewer than 10% of the shares of common stock of Central Bancorp.
To date, in significant part because of the preliminary injunctive relief issued by this Court and the Federal Court, there has been no “public announcement by the Company (by any means) or by an Acquiring Person (by means of filing a Schedule 13D under the Exchange Act or any comparable successor report or schedule or amendment thereto) that an Acquiring Person has become such” or any “public announcement by the Company (by any means) that an Adverse Person has become such.”
It is in the foregoing posture that the Court addresses the issues raised by the pending motions.
DISCUSSION
Summary judgment is granted where there are no issues of genuine material fact, and the moving party is entitled to judgment as a matter of law. Hakim v. Massachusetts Insurers' Insolvency Fund, 424 Mass. 275, *386 281 (1997); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no triable issue of fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989).
The parties and their counsel involved in this corporate tug-of-war are extremely sophisticated. This Court, therefore, will presume full understanding by all with respect to both the SRA and the statutory issues involved, as well as the purposes behind them.
What is presented to the Court is an array of legislation and an agreement, and actions taken purporting to comply therewith, somewhat obscured by the fog of mootness, that must be interpreted, construed and applied.
As recently as May 8, 2003, the Supreme Judicial Court restated and reaffirmed long-held principles of statutory construction. In Commonwealth v. Clerk-Magistrate of the West Roxbury Div. of the Dist. Court Dep’t, 439 Mass. 352, 355-56 (2003), the SJC said:
It is a standard canon of statutory construction that “the primary source of insight into the intent of the Legislature is the language of the statute.” International Fid. Ins. Co. v. Wilson, 387 Mass. 841, 853 (1983). A court may not add words to a statute that the Legislature did not put there. See General Elec. Co. v. Department of Envtl. Protection, 429 Mass. 798, 803 (1999), and cases cited. “Statutory language should be given effect consistent with its plain meaning and in light of the aim of the Legislature unless to do so would achieve an illogical result.” Sullivan v. Brookline, 435 Mass. 353, 360 (2001). See O’Brien v. Massachusetts Bay Transp. Auth., 405 Mass. 439, 443-44 (1989). Where, as here, the language of the statute is clear and unambiguous, it is conclusive as to the intent of the Legislature. See Pyle v. School Comn. of So. Hadley, 423 Mass. 283, 285 (1996).
Similarly, the interpretation of an unambiguous agreement is an issue of law for the Court. Lumbermans Mut. Cas. Co. v. Zoltek Corp., 419 Mass. 704, 707 (1995). Contract language must be construed in its usual and ordinary sense. 116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co., 433 Mass. 373, 376 (2001); Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998). A contract provision is ambiguous “only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.” Id. The mere fact that parties disagree on the proper construction of contractual language, however, does not necessarily establish ambiguity. Lumbermans Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).
Generally, “(t]he object of the court is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background and purpose.” USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989). The Court must act in a way to give effect to an agreement as a rational instrument in order to cany out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1990). Even in the case of an ambiguous agreement, interpretation is a matter of law for the Court except insofar as it may turn on facts in genuine dispute. Gross v. Prudential Ins. Co. of America, Inc., 48 Mass.App.Ct. 115, 119 (1999).
Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written contract. City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720 (1999).
In construing the Shareholder Rights Agreement, the Court must give effect to the intentions of the parties, as expressed in the language employed, considered in the light of the context of the situation and the purposes to be accomplished. Starr, supra, 420 Mass. at 190; Shea v. Bay State Gas Co., 383 Mass. 218, 224-25 (1981).
“The Declaratory Judgment Statute should be liberally construed and administered. See G.L.c. 231A, Sec. 9. A judge enjoys some discretion in deciding whether a case is appropriate for declaratory relief.” Pazolt v. Director of the Div. of Marine Fisheries, 417 Mass. 565, 569 (1994). Proceedings for declaratory relief should normally culminate in a declaration of rights rather than dismissal. Nawn v. Board of Selectmen of Tewksbury, 4 Mass.App.Ct. 715, 718-19 (1976). On the other hand, a Court may refuse to enter declaratory relief when such a judgment, if entered, will not terminate the controversy. But if on that ground alone, the reasons for a refusal should be stated in the record. Weinstein v. Chief of Police of Fall River, 344 Mass. 314, 317 (1962).
Where the case does not reduce to solely an issue of law without dispute as to the facts, maintenance of a declaratory judgment action is not favored. Ralph’s Wonder, Inc. v. Commissioner of Internal Revenue, 19 Mass.App.Ct. 928, 929 (1984).
A declaration of rights, duties and status under a statute is clearly a matter within the Declaratory Judgment Statute. See, e.g., City of Boston v. MBTA, 373 Mass. 819, 829 (1977). Also, a Rule 56 motion for summary judgment is an appropriate way to raise declaratory judgment issues. Farm Family Mut. Ins. Co. v. Whelpley, 54 Mass.App.Ct. 743, 747 (2002).
If the matters in issue are of public importance and they are likely to arise again, or if they are of general concern to corporations formed in Massachusetts, a Court may address those issues even in the face of some degree of mootness. See Ott v. Boston Edison Co., 413 Mass. 680, 684-85 (1992). It is the duty of the Court to declare as much of the rights of the parties as possible.[12] First Nat. Bank of Cape Cod v. North Adams Hoosac Sav. Bank, 7 Mass.App.Ct. 790, 797 (1979).
The Court first will consider the two statutes involved, G.L.c. 156B, Sec. 32A and Sec. 65. Thereafter, *387 the Court will explore the governing language of the SRA and conclude with the mootness issue.
The Statutory Provisions
Neither G.L.c. 156B, Sec. 32A nor Sec. 65 appears yet to have been interpreted by any appellate court. To that extent, their meaning and reach is a matter of first impression.
General Laws, c. 156B, Sec. 32A, first added by St. 1989, c. 242, Sec. 11, reads in its entirety as follows:
The terms and conditions of any rights or options issued by the corporation, including those outstanding on the effective date of this section, may include, without limitation, restrictions or conditions that preclude or limit the exercise, transfer, receipt or holding of such rights or options by any person owning or offering to acquire a specified number or percentage of the outstanding stock or other securities of the corporation, or any transferees of any such persons, or that preclude or limit such action based on such other factors, including the nature or identity of such persons, as the directors determine to be reasonable and in the best interests of the corporation. Nothing contained in this section shall affect the duties or standard of care of a director pursuant to section sixty-five of this chapter.
The Legislature spoke clearly and without ambiguity in Sec. 32A. Thus, a review of the SRA, read against the provisions of Sec. 32A, reveals that there can be no doubt that it was adopted, and contains provisions, wholly consistent with this statute. There is no need to parse the wording of the SRA or to further extend the discussion of this issue.
What does require explication, however, is the extent to which G.L.c. 156B, Sec. 65 affects the actions of directors taken pursuant to a properly created Sec. 32A shareholder rights agreement. The second sentence of Sec. 65[13] was added by St. 1989, c. 242, Sec. 13. Again, a full quotation of Sec. 65 is provided.
A director, officer or incorporator of a corporation shall perform his duties as such, including, in the case of a director, his duties as a member of a committee of the board upon which he may serve, in good faith and in a manner he reasonably believes to be in the best interests of the corporation, and with such care as an ordinary prudent person in a like position would use under similar circumstances. In determining what he reasonably believes to be in the best interests of the corporation, a director may consider the interests of the corporation’s employees, suppliers, creditors and customers, the economy of the state, region and nation, community and societal considerations, and the long-term and short-term interests of the corporation and its stockholders, including the possibility that these interests may be best served by the continued independence of the corporation. In performing his duties, a director, officer or incorporator shall be entitled to rely on information, opinions, reports or records, including financial statements, books of account and other financial records, in each case presented by or prepared by or under the supervision of (1) one or more officers or employees of the corporation whom the director, officer or incorpo-rator reasonably believes to be reliable and competent in the matters presented, or (2) counsel, public accountants or other persons as to matters which the director, officer or incorporator reasonably believe to be within such person’s professional or expert competence, or (3) in the case of a director, a duly constituted committee of the board upon which he does not serve, as to matters within its delegated authority, which committee the director reasonably believes to merit confidence, but he shall not be considered to be acting in good faith if he has knowledge concerning the matter in question that would cause such reliance to be unwarranted. The fact that a director, officer or incorporator so performed his duties shall be a complete defense to any claim asserted against him, whether under sections sixty to sixty-four, inclusive, or otherwise, except as expressly provided by statute, by reason of his being or having been a director, officer or incorporator of the corporation.
Section 65 can be seen as setting forth in Legislative words what is generally referred to as the business judgment rule. See S. Solomont & Sons Trust, Inc. v. New England Theatres Operating Corp., 326 Mass. 99, 113-15 (1950). See also, Harhen v. Brown, 431 Mass. 838, 842-45 (2000), wherein the Supreme Judicial Court discussed the business judgment rule without specifically citing to G.L.c. 156B, Sec. 65.
G.L.c. 156B, Sec. 32A and Sec. 65, as enacted and amended in 1980 and 1989, are specifically intended by the Legislature to give protection to Massachusetts corporations from abusive takeovers which challenge the long-term growth of the Commonwealth’s economy, the creation of new jobs and the long-term interests of shareholders. The Governor, in submitting the legislation to the Senate and House of Representatives on May 24, 1989, included in his Message the following commentary:
Enactment of the proposed legislation will provide Massachusetts corporations the security they need to make the long-term investments in research and development, product, market and human resource development and plant modernization essential to meeting the challenges of competition in the world marketplace. Enactment will also facilitate the transition of employees affected by takeovers by ensuring that collective bargaining agreements negotiated with prior management are honored and that employees who lose their jobs as a result of takeovers receive severance. By deterring speculative takeovers, this initiative will foster the long-term investments that are essential to a dynamic and growing economy and *388 to the economic well-being of all Massachusetts citizens.
Governor’s Message to the Senate and House of Representatives, May 24, 1989.
Governor’s Messages are often quite helpful in understanding the reason for certain legislation. See, e.g., Conners v. Northeast Hospital Corporation, 439 Mass. 469, 473 (2003).
“It can be presumed that new legislation alters existing law.” Morrison v. Lennett, 415 Mass. 857, 863 (1993). At the same time, a statute should not be interpreted as effecting a material change in the common law unless the intent to do so is clearly expressed. See, e.g., Taygeta Corporation v. Varian Associates, Inc., 436 Mass. 217, 226 (2002). When, however, the nature and purpose of a statute specially applicable to a particular situation provides no justification for a Court to qualify its wording by importing conditions or limitations not expressed therein or deemed to give effect to its main purpose, then a Court should not do so. General Electric Company v. Department of Environmental Protection, 429 Mass. 798, 802 (1999). See also Direct-Mail Service, Inc. v. Registry of Motor Vehicles, 296 Mass. 353, 356 (1937).
Here, Sec. 65 clearly states that the “fact that a director... performed his duties [in a manner consistent with that section] shall be a complete defense to any claim asserted against him, whether under sections sixty to sixty-four, inclusive, or otherwise, except as expressly provided by statute, by reason of his being or having been a director ... of the corporation.” This language clearly expresses the Legislative intent that it is compliance with Sec. 65, and nothing else, that is the complete defense. To that extent the common law has been changed.
This is the context in which this Court assesses G.L.c. 156B, Secs. 32A and 65.
Here, as seen in the Background Section above, the Central Bancorp Board is comprised of a majority of independent directors. See Harhen, supra, 431 Mass. at 842-43. That Board included, at the time of appointing the Special Committee, two directors elected at the urging of the PL Capital parties.[14] The Special Committee is itself made up solely of three of the independent directors, and was charged with the duty to investigate, report and recommend appropriate action on the matters in issue. This Court, therefore, reads Harhen, supra, 431 Mass. at 844-45, to mandate that when there is a matter considered by a committee of independent directors appointed to act by a board itself consisting of a majority of independent directors, the business judgment rule affords complete protection to the business decisions of the directors because they are presumed to act in the best interests of the corporation. This seems particularly so when the action taken is specifically permitted by legislation.
Consequently, G.L.c. 156B, Sec. 65, containing the Legislature’s formulation of the business judgment rule for purposes of shareholder rights agreements, among others, must be read as the sole controlling statute in connection with the actions pursuant to the SRA taken by the Directors here. In the situation presented to this Court, it should not add words to Sec. 65 “that the Legislature did not see fit to put there.” General Electric Company, supra, 429 Mass. at 803. Nor should this Court cause the Legislative language chosen to be modified or altered by imposing thereon common-law concepts or the law of other jurisdictions. See, e.g., Piemonte v. New Boston Garden Corp., 377 Mass. 719, 723 and n.4 (1979).[15] Particularly given the history leading to the enactment of the anti-takeover legislation in the Commonwealth, any alteration or gloss thereon must be the work of the Legislature itself, not a Trial Court judge.
In Sec. 65, the Legislature has stated clearly what it is that constitutes a fair exercise in good faith of the power with which directors of Massachusetts corporations are clothed when dealing with a Sec. 32A shareholder rights agreement. The legislature is presumed to have known fully the holdings in Elliot v. Baker, 194 Mass. 518 (1907), Albert E. Touchet, Inc. v. Touchet, 264 Mass. 499 (1928), and Andersen v. Albeit & J.M. Anderson Mfg. Co., 325 Mass. 343 (1950), when it made its statement in Sec. 65. It did not choose to incorporate the concepts in those cases in Sec. 65.
This Court should not “add words to a statute that the Legislature did not put there, either by inadvertent omission or by design.” Fafard v. Lincoln Pharmacy of Milford, Inc., 439 Mass. 512, 515 (2003). “A statutory expression of one thing is an implied exclusion of other things omitted from the statute.” Id.
In responding to the arguments by the PL Capital Group that this Court should either import the proportionality doctrine in Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946, 955 (Del. 1985), or aspects of the Massachusetts common law relating to fiduciary duties of directors, as a gloss on the protective reach of Sec. 65, the Court is reminded of Justice Cardozo’s eloquent comments on the role of the judge, particularly at the trial level:
The judge, even when he is free, still is not wholly free. He is not to innovate at pleasure. He is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to “the primordial necessity of order in the social life.”
Cardozo, Nature of Judicial Process, p. 141 (1921).
The Shareholder Rights Agreement and Mootness
The SRA established a two-step process to trigger the Rights created by it. The first step consists of a determination by the Directors of the existence of an Acquiring Person or an Adverse Person, as those words are defined in the SRA. Among other things, neither *389 an Acquiring Person nor an Adverse Person can exist without that Person being a Beneficial Owner of 10% or more of the outstanding shares of the common stock of Central Bancorp.
The second step requires that after the existence of an Acquiring Person or an Adverse Person is determined, there must come into being a Distribution Date. As described above in the Background Section, a Distribution Date is established, among other ways, when there occurs the first public announcement by Central Bancorp (by any means) that an Acquiring Person has become such or the first public announcement by Central Bancorp (by any means) that an Adverse Person has become such.
At this time, neither of such public announcements has occurred.
Further, although the Special Committee, and the full Board of Directors of Central Bancorp, may have made the necessary determination that a certain group was an Acquiring Person or an Adverse Person in January 2003, and again in early May2003, no such Person exists today because the May 8-12, 2003, sales of stock by the Seidman parties reduced the shareholdings of the particular group so determined below 10%. Consequently, in the three cases before it, regardless of any action taken by this Court to vacate the preliminary injunctive relief outstanding, a Distribution Date cannot be established because there is not now, as there must be, either an extant Acquiring Person or an extant Adverse Person.
In construing the SRA this Court must, among other things, give weight and meaning to the words and the grammatical structure used. See, e.g., Moulton v. Brookline Rent Control Bd., 385 Mass. 228, 230-32 (1982). The missing public announcement that a person “has become” an Acquiring or Adverse Person employs the present perfect grammatical structure. Consequently, it includes the concept of an action which is continuing up to the present time. Were the announcement to include events that occurred in the past and are no longer existing, the proper tense would be the simple past, and the language would have spoken of when the Acquiring or Adverse Person “became” such.
The present perfect tense “indicates action that was started in the past and has recently been completed or is continuing up to the present time.” Sabin, ed., The Gregg Reference Manual (9 th Edition). It makes no sense to construe this language other than to relate to a condition started in the past that “is continuing up to the present” time. After all, it is the impact of the Acquiring or Adverse Person on the corporation now or in the future that the SRA is designed to protect against. Given the purpose of the SRA, what difference would it make if there had been an Acquiring or Adverse Person at some time in the past, now no longer existing, who never had any impact on the corporation? And why should that person or his transferees now suffer a dilution in their current shareholdings?
The wording selected in the definitions of Acquiring or Adverse Persons themselves speaks in the present tense. The words used are “any Person who is a Beneficial Owner,” or a “Person declared as such . . . [who] has become the Beneficial Owner . . . and is intended to cause, is reasonably likely to cause or will cause" certain action by Central Bancorp to take place, “or such Beneficial Ownership is having or is reasonably likely to have a material adverse impact.. .” (Emphasis added.)
Other aspects of the SRA similarly speak of the present and actions that may occur in the future. In short, the Poison Pill involved here looks to the present and the future impact of the Acquiring or Adverse Person on Central Bancorp.
Nothing in the February 11, 2003, amendment to the SRA alters this situation.
Central Bancorp may not hereafter trigger the Poison Pill — at least until some new Acquiring Person or Adverse Person is determined to exist. The Special Committee and the Central Bancorp Board have not, at this time, determined that the PL Capital Group and the Seidman transferees — whoever the latter may be — constitute an Acquiring or Adverse Person. What the Special Committee determined and recommended, and the full Board acted upon, was the “result of a block trade on November 4, 2002,” whereby “the PL Capital Group, Joseph Stil-well, Lawrence B. Seidman and Robert Reichenbach” became beneficial owners of 17.7% of Central Bancorp’s outstanding stock. The persons who once may have constituted an Acquiring or an Adverse Person — the PL Capital Group, Joseph Stilwell, Lawrence B. Seidman and Robert Reichenbach — no longer exist as a Beneficial Owner. This is because Joseph Stilwell, Lawrence B. Seidman and Robert Reichenbach are no longer owners of any Central Bancorp stock and, therefore, the combined group consisting of “the PL Capital Group, Joseph Stilwell, Lawrence B. Seidman and Robert Reichenbach” no longer constitutes an Acquiring or Adverse Person. Nor can they pose any threat or have any impact on Central Bancorp.
Many of the issues in all three of these cases have become moot. For the Court to issue a declaratory judgment, “the question presented must be a live one and not one which is moot.” Nolan, Civil Practice, 9A M.P.S. Sec. 1109. See also Jefferson Const. Corp. v. Commonwealth, 386 Mass. 142, 143-44 (1982).
“ The duly of this [C]ourt ... is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions ...’ Caputo v. Board of Appeals of Somerville, 330 Mass. 107, 111 (1953), quoting from Mills v. Green, 159 U.S. 651, 653 (1895).” Id. at 143. See also Brown v. Neelon, 335 Mass. 357, 360 (1957).
Thus, a Court may properly refuse total declaratory relief where, as here, some parts of the controversy have become moot in significant part. Clinton Housing *390 Authority v. Finance Committee of Clinton, 329 Mass. 495, 499 (1952).
Here, there are three basic issues about which this Court must consider rendering declaratory relief. First is the issue of what is the legal standard to be applied to the Massachusetts statutes that permit the adoption and execution of a shareholder rights agreement. Second, in two parts, is an application of that law which includes, in this order, (a) whether there was, or hereafter can be, a determination of an Acquiring or Adverse Person, and (b) whether the Central Bancorp Board of Directors acted consistent with the law in the process.
This Court concludes that it can — and should— enter declaratory relief regarding the first issue and the first part of the second issue. It should not, however, make a declaration regarding the second part of the second issue because to do so would be to render an opinion on what has become a moot issue.
ORDER
For the foregoing reasons, the Plaintiffs’ Motion for Partial Summary Judgment in Case No. 03-0547 BLS and the Motion for Summary Judgment in Case No. 03-0554 BLS are each ALLOWED in part and DENIED in part, as to all three of these consolidated cases. However, on the parts of the motions that are denied, it is nevertheless proper for the Court to grant summary judgment for the opposing Central Bancorp parties. See Mass.R.Civ.P. Rule 56(c).
A final judgment is to be entered in each of these three cases reading, declaring and ordering as follows:
The standards set forth in Mass. G.L.c. 156B, secs. 32A and 65, with no additional or heightened judicial scrutiny, are the standards that apply to actions taken with respect to a shareholder rights agreement of a Massachusetts corporate entity adopted pursuant to Sec. 32A, either directly or on a recommendation of a special committee of a board of directors, of which board a majority is independent and which special committee itself is made up solely of independent directors;
Although the Board of Directors of Central Bancoip, Inc. may have determined in January2003, and again in May 2003, that an Acquiring or an Adverse Person, as those terms are used in its October 11, 2001, Shareholder Rights Agreement, as amended, once existed, it cannot now establish a Distribution Date with respect thereto because no such Acquiring or Adverse Person continues to exist at present and the Board cannot make a new determination in the absence of evidence that such an Acquiring or Adverse Person exists at the time such determination is made; and
On mootness grounds, it would be inappropriate for this Court to determine whether, on the facts before it, the Central Bancorp Board of Directors acted in a manner consistent with the applicable law with respect to the parties involved in these three cases.
Consequently, except for the two preceding declarations, judgment shall enter dismissing each of these actions, including both the complaints and any counterclaims, with prejudice, each party to bear his, her or its own costs.

The Emergency Judge was advised that Thomas J. Dougherty, counsel for Central Bancorp, had, in writing, threatened to trigger the Poison Pill process “should [the plaintiffs] ... file legal action against the Company or any of its directors in regard to this demand.”

It does not appear that the Emergency Judge who granted the TRO in the Seidman Claim was made aware of the prior filed Federal Action or its relationship to this action.

This Court was advised earlier that the Federal complaint was amended to add a count under one of the Federal securities laws and to add another party defendant. Since that time, however, the Federal claim has been dismissed or withdrawn.

Mr. Goodbody passed away unexpectedly on May 2, 2003. He has since been replaced on the Central Bancorp Board by James Linnehan. Mr. Linnehan is also an independent director.

Central Bancorp, without any affidavits or other record support, suggests that these sales, in some way, may have been to parties in league with Seidman. There being no record evidence to support Central Bancorp’s speculation, this Court cannot rely thereon in making its present rulings.

Here it is not just the litigating parties that seek declaratory relief. Judge Harrington in the Federal Action has stayed the proceedings before him until the State law issues are resolved.

Sec. 65 was rewritten in 1980. See St. 1980, c. 265. Also, there was a minor amendment, dropping a comma after the word “officer” in the third sentence, added by St. 1996, c. 450, Sec. 196.

Garrett Goodbody and Richard J. Fates.

Whether some heightened scrutiny should apply to a board of directors that does not consist of a majority of independent directors, such as in Houle v. Low, 407 Mass. 810 (1990), is not for a Trial Court to muse upon on a record such as that before it here, where all the directors are conceded to be independent on the Special Committee and a majority thereof are conceded to be independent on the full Board.