Agnes, Peter W., J.

I. INTRODUCTION

This is a civil action in the nature of a shareholder derivative action by Philippe Gut and Gwen Pratt Gut (“plaintiffs”), two minority shareholders of defendant Westboro Financial Services, Inc., a mid-tier holding company of defendant Westboro Bank. Defendant Westboro Financial Services, Inc. is majority owned by defendant Westboro Bancorp, MHC, a Massachusetts chartered mutual holding company.[2] Defendant Westboro Bancorp, MHC owns approximately 64% of the outstanding shares of defendant Westboro Financial Services, Inc. and is controlled by a board of trustees most or all of whom also serve as its directors.
*111 The plaintiffs allege that a pending merger agreement between Westboro and Assabet Valley Bancorp (“Assabet”) whereby Assabet will acquire the outstanding publicly owned shares of Westboro Financial’s common stock for the price of $35 per share should be enjoined under Massachusetts law because the price per share is “grossly inadequate."[3] In a nutshell, the plaintiffs claim that the merger deal has been driven by defendant Joseph F. MacDonough, who is the CEO and a director of Westboro and that he and other directors of Westboro are “conflicted” and not disinterested, and have pursued a course of conduct which amounts to self-dealing to the great detriment of the minority shareholders of Westboro. The plaintiffs allege, in particular, that (1) the process leading to the merger was flawed and unlawful because Westboro pursued a one-party negotiation with As-sabet instead of “shopping” the bank around in hope of attracting a merger partner willing to pay a higher price for the common stock, (2) that upon reaching a tentative deal with Assabet, Westboro entered into an unreasonable “lock-up” agreement which contained a 5% termination fee that effectively foreclosed other potentially interested parties from entering the merger competition and correspondingly prevented Westboro from giving meaningful consideration to any other bidders, and (3) that following the agreement with Assabet, Westboro rejected out of hand several offers which would have resulted in a price per share of Westboro common stock of $38.50, $40.00 and $41.00 respectively.
The defendants deny each and eveiy one of these allegations. The defendant Directors of Westborough maintain that they are disinterested and that they have acted at all times in accordance with their fiduciary obligations which under Massachusetts law are owed to the investors in defendant Westboro Bancorp, MHC, local economic and community interests, and the minority shareholders. The defendants maintain that the decision to enter into a one-party negotiation was not a rush to judgment, but rather a considered, tactical choice after receiving neutral and expert advice from their independent financial advisor, Richard Lewis Quad of RBC Capital Markets (“RBC”), and after a Board evaluation that identified Assabet as the strongest prospect. The defendants also maintain that the compensation and benefits to be paid by Assabet to certain officers and directors of Westboro as a result of the merger did not result in a windfall, but rather was less than the compensation these individuals were entitled to as a result of pre-merger agreements they had with Westboro. The defendants also maintain that they did not foreclose consideration of potentially better merger deals after entering into an agreement with Assabet and that there was nothing in their agreement with Assabet that effectively prevented others from exploring a merger with Westboro. Finally, the defendants maintain that there was never an offer higher than $35.00 per share of common stock from a potential merger partner that was in the best interests of Westboro.
This matter came before the Court for argument on August 9, 2007. Under the terms of the merger agreement between Westborough and Assabet, if the merger is not consummated by August 15, 2007, Assabet can walk away from the deal and leave Westborough to pursue whatever other options may exist.

II. STANDARD FOR GRANTING A PRELIMINARY INJUNCTION

In deciding whether to grant a preliminary injunction, the court is required to perform a multi-part analysis. Packaging Industries Group, Inc. v. Cheney, 380 Mass. 606, 616-17 (1980). Initially, the court must determine whether the moving party has demonstrated a likelihood of success on the merits, and that it faces a substantial risk of irreparable harm— losses that cannot be repaired or for which compensation will not be adequate after final judgment — if the motion for the preliminary injunction is not granted. Id. at 617 & n.11. See Hull Mun. Lighting Plant v. Massachusetts Municipal Wholesale Elec. Co., 399 Mass. 640, 641 (1987). If the moving party has met this burden, the court must then engage in a balancing test in which the irreparable harm faced by the moving party is compared to the harm that an injunction would inflict on the other party. “If the judge is convinced that failure to issue the injunction would subject the moving party to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party.” Id. at 617. In balancing these factors, “(w]hat matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party’s chance of success on the merits. Only where the balance between these risks cuts in favor of the moving party may a preliminary injunction properly issue.” Id. Furthermore, in an appropriate case, “the risk of harm to the public interest also may be considered.” Brookline v. Goldstein, 388 Mass. 443, 447 (1983). See also LeClair v. Town of Norwell 430 Mass. 328, 337 (1999); Commonwealth v. Mass. CRINC, 392 Mass. 79, 89 (1984).

III. FACTUAL BACKGROUND

Unlike the typical case in which a preliminary injunction is sought on the basis of an abbreviated and often incomplete set of facts, the parties in this case have engaged in pretrial discovery and have supplied the court with a substantial record consisting of pleadings, depositions, affidavits and various attachments. The court has reviewed the record in its entirety. Nonetheless, the following factual findings are preliminary in nature and not necessarily controlling on the court at trial.

*112
A. Events Leading Up to the Consideration of a Merger by Westboro

Westboro Bank was chartered in 1869 (coinci-dently, the same year as Assabet) and operated as a state chartered mutual savings back until 2000. In that year, Westboro reorganized into a Massachusetts mutual holding company. The Westboro Bank became a Massachusetts chartered stock savings bank, wholly-owned by Westboro Financial. Westboro MHC was formed and became the mutual holding company parent of Westboro Financial. Westboro MHC owns approximately 64% of Westboro Financial’s outstanding common stock. The remaining 36% is publicly owned.
Westboro Bank is headquartered in Westboro and maintains offices in the towns of Northboro and Shrewsbury. I accept as credible the characterizations by Joseph F. MacDonough who is the President and Chief Executive Officer (“CEO”) of Westboro Bancorp MHC, Westboro Financial Services, Inc., and the Westboro Bank of the bank’s mission and the nature of its business:
Westboro Bank is a community-oriented financial institution, offering a variety of financial services to meet the needs of the communities it serves. In addition to offering traditional banking services, Westboro Bank sponsors a host of community activities to enhance the social and economic welfare of the communities it serves.
Westboro Bank’s principal business consists of attracting retail deposits from the general public and investing those funds primarily in loans secured by first mortgages on owner-occupied, one- to four-family residences, and, to a lesser extent, in commercial real estate and commercial loans to small businesses. Total assets as of June 30, 2007 were approximately $298 million, of which loans comprised approximately $205 million, and total deposits were approximately $213 million.
Affidavit of Joseph F. MacDonough, para. 5-6.
It is apparent from the record before me that over several years prior to 2006, Westboro Bank began to experience financial difficulties. Mr. McDonough described the decline as a result of a combination of factors including competition from less regulated financial service providers, local expansion of credit unions and large national banks, and “interest margin compression” due to the increasing cost of compliance with new federal laws and the bank’s emphasis on residential lending. Affidavit of Joseph F. MacD-onough, para. 8. According to Mr. James N. Ball, a trustee of Westboro Bancorp MHC, and a director of both Westboro Financial Services, where he serves as chair of the Non-deposit Investment Products Committee, and the Westboro Bank, where he serves as a member of the Long Range Planning Committee, concerns about the bank’s financial future in the period prior to 2006 stemmed from litigation expenses and adverse publicity due to a theft by an employee, the firing of another employee for not reporting certain commissions he was required to share with the bank, the “net interest margin compression” resulting from an increase in the Federal Reserve Bank’s interest rate, and the lower profit earned by the bank due to its “heavy reliance on residential lending.” Affidavit of James N. Ball, para. 7-8.
I accept as credible Mr. Ball’s characterization of the motives that led Westboro Bank to begin looking for a merger partner.
The impact of the flat yield curve on the Bank’s residential-heavy loan portfolio, together with intense competition for residential mortgage loans, prompted the Board to look for ways to become more involved in the more interest rate-sensitive commercial loan arena. Commercial deposits are attractive because they are low cost (no or low interest). For these reasons, the Board became interested in finding a merger partner with an established commercial department, which Westboro lacked.
Affidavit of James N. Ball, para. 9.

B. Westboro Obtains Independent Expert Advice About Its Options

RBC is an international corporate and investment bank. Mr. Richard Quad is a director in the Financial Institutions Group of RBC who has a background in commercial banking in the northeast United States with experience in mergers and acquisitions involving banks both smaller and larger than Westboro. At the end of 2004, the Westboro Bank hired RBC to serve as its independent financial advisor regarding the potential for a going private transaction. Richard Quad was assigned by RBC as the advisor to Westboro and tasked with the responsibility to gather the required data and prepare the necessary presentations to enable Westboro to make appropriate business decisions. I generally credit the statements contained in his affidavit. Following a delay attributable to Westboro’s need to resolve some complications over unrelated litigation, both the Westboro Bank’s board and Mr. Quad reached the conclusion that “expenses saved by a going private transaction would not be sufficient to cope with endemic and systematic problems with earnings and profitability that Westboro was facing.” Affidavit of Richard Quad, para. 8. The Westboro Board also considered and rejected another alternative involving a “second-step” conversion in which it would raise funds by selling to the public the 64% of its shares held by Westboro Financial. “This transaction was inappropriate, however, primarily because Westboro had not fully utilized the capital it raised in the partial conversion in 2000 and was not projected to need capital throughout the term of the five-year forecast that we [RBC] constructed in conjunction with this assignment.” Quad affidavit, para. 9. “By the end of 2005, Westboro had decided to *113 abandon the potential going private transaction and focus on a transaction where Westboro would combine with another institution to help its sagging performance.” Quad affidavit, para. 10.
To assist the Westboro board in making a decision, Richard Quad prepared and delivered to them a slide presentation consisting of an analysis of three different types of transactions: (1) acquisition by Westboro of a smaller institution, (2) mergers with similar size institutions, and (3) acquisitions of Westboro by larger size institutions.[4] The Quad presentation was delivered to the Westboro Board on November 21,2005 and included a notation that the bank and its directors had at least two interests to consider going forward — a duty to the “customers, employees and the community,” on the one hand, and a duty to the “public shareholders.” Quad affidavit, exhibit 1 at 5. It was at this November 21, 2005 presentation, based on an analysis by Mr. Quad, that RBC offered to Westboro an opinion consisting of “an estimated range of $30.00-$35.00 per share for the public shares.” Quad Affidavit at para. 12.
C. The Decision to Pursue a Single-Party Negotiation With Assabet
Following the presentation of November 21, 2005, the Westboro Board had several discussions about merger possibilities and the best process to undertake. Prior to the involvement of RBC, CEO MacDonough had had informal discussions, over the years, about the possibility of combinations involving the Westboro bank and other financial institutions. I credit the statement by Mr. MacDonough that
[a]s part of my job as CEO of Westborough, I frequently met with CEOs of different banks. At times, these meetings resulted in some informal discussion of possible combinations. Starting in early 2005, I remember having such informal discussions with Assabet Valley Bancorp, Marlborough Savings Bank and Commonwealth National Bank. The informal discussions I had with both Oliver Nunes and Mark O’Connell at Assabet provided me with credible evidence that Assabet could be a viable merger partner, both geographically and financially. However, no agreement, formal or informal, relating to a merger or any other transaction between the two entities was considered or reached in 2005 ... It was not until November 2006 that the parties [Assabet and Westboro] entered into the Agreement and Plan of Merger.
MacDonough Aff. Para. 13-14. I also credit the statement by Director Ball that prior to 2005, Westboro had no interest in a merger with Assabet or any other bank. Aff. of James Ball, para. 15. Other members of the Westboro Board were aware of Mr. MacDonough’s informal discussions. See Affidavit of Paul McGrath, para. 5.1 also credit Mr. MacDonough’s further statement that Westboro made the decision to pursue a single-party negotiation with Assabet as a result of a process that involved a consideration of Westboro’s fiduciary obligations “to all of the bank’s constituencies, including its shareholders and depositors, and, at all times throughout the process, the Board met with and sought advice from its legal and financial advisors.” MacDonough Aff., para. 15. '
The process followed by the Westboro Board, with the assistance of Mr. Quad, was to develop criteria to help it identify viable merger candidates. According to Mr. Quad,
These criteria included: geographic proximity, established commercial lending and trust departments, culture (a focus on community banking with small to mid-sized customers), as well as a history of community involvement and commitment to charity. The Board was also interested in not having to close branches or terminate employees and being able to continue to have some control over the newly merged entity to ensure that it would continue to meet the community’s needs.
During the merger discussions, I presented what has been called “the grid” which contained several potential merger candidates. It included six candidates that I initially culled from the original list of potential merger candidates in November 2005, and one, Southbridge Savings Bank, which I added after the Board asked me to further review the original list and make sure that I found all of the entities that met their selection criteria.
At this same meeting, James Ball, a Westborough director, also prepared a grid comparing the same seven entities. There was extensive discussion of the merits of each candidate and the Board members provided their personal knowledge of the management for the various entities. A significant open issue was whether to approach one entity or multiple entities to discuss the possibility of a merger. This issue was the primary topic at several subsequent meetings over a three week period.
To assist the Board in this process, I prepared a two page handout that listed both “pros” and “cons” associated with engaging in merger negotiations with one or multiple parties.
Also during this time, I prepared a substantial binder of materials containing all of the information on Westborough that a potential merger partner would find useful, regardless of whether Westborough decided to negotiate with one or multiple partners.
Eventually, the Board decided to negotiate with Assabet, and the binder of information was delivered to them and their investment banker, Robert Hutchinson of Keefe, Bruyette & Woods, Inc. *114 generated criteria and characteristics that were desirable to the Board in a merger partner. These included mutual holding company form, geographic proximity to Westborough; community bank philosophy; asset/loan portfolio mix complementary to Westborough (sic); growth (both loans and assets); recent expansion; deposit portfolios; investment portfolios; additional products and services; management talent; and a strong commercial department. The Board determined that only other mutual holding companies should be considered because a full stock bank was undesirable due to the Bank’s overcapitalization. At meetings with RBC, in late 2005 and early 2006, LPRC and Board members asked many questions of RBC to make sure each of the criteria was being adequately considered.
*113 Quad Aff. Para. 14-19. I also credit Director Ball’s statements about the process, including in particular, his observation that the Westboro Board,
*114 The Board provided RBC with the characteristics and criteria for a merger partner, and RBC reverted with a list of banks that had at least some of those characteristics to some degree that were also not more than fifty (50) miles from the Bank’s current home office in Westborough. Eventually the list was reduced to seven banks; Assabet Valley Bancorp (“Assabet”); Webster Five Cents Savings Bank; Marlborough Savings Bank; Bay State Savings Bank; Clinton Financial Services; Unibank; and Southbridge Savings Bank.
Affadavit of James N. Ball, para. 11-12.
Once the Westboro Board had developed its criteria and identified viable merger partners based on the analytical work performed by RBC, it undertook a process of review and evaluation. I credit the statement by Director Ball concerning this phase of the process.
As part of the process of evaluating prospective merger partners, I created a chart that roughly outlined some of my initial impressions of the seven banks we were considering. [See PI. Dep. Ex. 4, annexed to the affidavit of Kenneth E. Lee as Exhibit 4.) The chart reflected only my preliminary understanding of the application of some of the characteristics the Board was considering to the various candidates. It by no means represents either my final view or any other Board member’s view at any time of the relative merits of any of the banks it depicts. In fact, it is now my understanding that the chart is inaccurate in certain respects. For example, it indicates that Assabet lacked a charitable foundation, which I subsequently learned is not the case. In addition, it suggests that several banks would have made equally good merger partners as Assabet, and after several months of deliberation in early 2006, the consensus view of the Board was clearly that Assabet was the stronger candidate by a comfortable margin.
Aff. Of James Ball, para. 13.[5]
I also credit Director Ball’s statements that the ultimate decision to pursue a single party negotiation with Assabet was a judgment based on three factors— First, a sense that the potential advantage of a multiparty process, which could lead to a higher price for the publicly owned shares, was offset by the risk that a lengthy multi-party negotiation process would so expose Westboro’s “eroding earnings” that it could produce a lower price for the publicly held shares;[6] Second, a sense that the Board’s research and analysis, aided by the independent advice supplied by RBC, “revealed that Assabet was uniquely positioned to fulfill the criteria Westborough considered critical for any merger partner” based on its complementary products and services, geographic proximity and similar culture; and Third, a sense “that if negotiations with Assabet did not produce an acceptable offer on all terms, the Board always had the option to open up negotiations with other banks.” Aff. James N. Ball, para. 16-17. As Mr. MacDonough put it, “(the Board sought the advice of its financial advisors as to the range of value it might obtain for the shares in a merger transaction. The Board determined that if a transaction with Assabet would not result in sufficient value for Westborough Financial’s public shareholders, then Westborough would hold discussions with additional potential partners.” Aff. Joseph F. MacD-onough, para. 21.

D. The Process Leading to the Decision to Merge With Assabet

The negotiation between Westborough and Assabet took place primarily during the. months of April and May 2006. CEO MacDonough did discuss the subject of his continued employment and the acceptance of his terms of employment with Westborough following the merger. I credit his statement that “no specific compensation or financial terms for . . . [his] continued employment were discussed until the fall of2006.” Aff. Joseph F. MacDonough, para. 23. On or about August 4, 2006, Assabet delivered to Westborough a draft term sheet highlighting some of the key components of a merger including an offer to “cash-out” Westboro’s publicly owned shares for $33.00 per share.[7] This draft was considered by the Westborough board and rejected. The Westborough board directed RBC to attempt to obtain an increase in the per share price of Westboro’s common stock to $35.00. This was accomplished. Assabet agreed to increase the price per share to $35.00. See Aff. Joseph F. MacDonough, para. 23-24; Aff. Richard Quad, para. 21-22; Aff. of Robert A. Klugman, para. 18.
Negotiations between Westborough and Assabet continued until November 13, 2006 when a special meeting of the Westborough board and its legal and financial advisors was held which resulted in a unanimous approval. I credit the statements of Mr. MacD-onough as follows:
*115 The Board consulted with its legal counsel and reviewed the terms of the Merger Agreement and RBC fairness opinion, which opinion concluded that the $35.00 per share that Assabet offered as consideration for Westborough Financial’s public shareholders was fair from a financial point of view. The $35.00 per share price represents a 12.9% premium over the closing price of $31.00 per share on November 13, 2006, the business day immediately preceding the public announcement of the merger, as reported on the Over-the-Counter Bulletin Board. It is also a 22.9% premium over the average trading price of the stock for the 30-day period prior to November 13, 2006; a 25% premium over the average trading price of the stock for the previous year.
Aff. of Joseph F. MacDonough, para. 25.[8] Despite the claim by the Defendants at oral argument that the merger agreement also has been approved by a majority of the public shareholders, the Plaintiffs are correct that of the minority shareholders who actually cast a vote on the merger at the July 24, 2007 meeting, a majority voted against the agreement. See Plaintiffs’ Reply Brief at 1.
E. The Terms of the Proposed Merger

(1) Financial Terms

The above mentioned $35.00 per share price to be paid by Assabet as part of the “cash out” of shareholders applies equally to any Directors of Westborough who also are public shareholders of Westborough Financial. Aff. of John L. Casagrande, para. 24. Other financial terms of the merger have a special impact on Westborough CEO Joseph F. MacDonough and Westborough CFO John L. Casagrande. In the case of Mr. McDonough, he will continue to occupy a senior position in the new bank although by no means a position of comparable influence and authority. I credit his statement as follows:
In order to facilitate Westborough and Assabet’s transition from two independent financial institutions to one merged entity, Assabet and Westborough have employed measures intended to ensure that both parties are represented in the New Entity. Among other things, upon the completion of the Proposed Merger, I will continue to be employed by the new bank, albeit in a more limited capacity than my current positions with Westborough. I also anticipate serving on the board of directors of New Bank and as trustee of the merged mutual holding company.
My employment agreement with Westborough dated March 17, 2000 will be terminated upon consummation of the Proposed Merger in exchange for a cash payment at that time in the amount of $330,000.
In recognition of my work, including my efforts that led to the Merger Agreement, Westborough agreed to pay me a bonus in the amount of $250,000 for calendar year 2006.
Aff. Joseph F. MacDonough, para. 27-29; Aff. Joseph Casagrande, para. 5-13.
I also credit the statements of CFO Casagrande to the effect that under the terms of his employment agreement with Westborough, he is entitled to a “severance payment” of $373,000 in the event of a demotion or loss of significant authority or responsibility. Under the Proposed Merger, since he will not serve as the CFO (but instead will serve as a consultant), he would be entitled to the “severance payment.” As an alternative, the Proposed Merger includes a term that will give Mr. Casagrande a lower “termination payment” in the amount of $126,000 plus accrued unpaid salary and vacation. Aff. Joseph Casagrande, para. 5-13. While Assabet also may become liable for certain excise taxes that may be owed by Mr. MacDonough and Mr. Casagrande, each of them has waived their rights under their preexisting employment agreements to be indemnified for such taxes by Westborough. Aff. Joseph Casagrande, para. 9.
In addition to these payments to Mr. MacDonough and Mr. Casagrande, the Proposed Merger agreement affects the terms of certain of Westborough’s Supplemental Executive Retirement Plans (SERP) for Mr. MacDonough, Mr. Casagrande, and Vickie A. Bouvier (Westborough’s senior Vice-President and Senior Operations Manager). Each of these individuals were fully vested in these agreements before the Proposed Merger. First, benefits were calculated on a going forward basis for each of the SERPs as if the individual in question had continued to work until age 65 and had received an annual salary increase and bonus of 5% per year. Second, on December 18, 2006 the “change of control” provisions of the three SERPs were amended to provide for a lump sum payment of benefits (discounted for present value) to Mr. MacD-onough, Mr. Casagrande and Ms. Bouvier on completion of the Proposed Merger whether or not employment is terminated.[9]
The Proposed Merger also affects the interests of employees of Westborough who participate in Westborough Financial’s employee stock plan. Essentially, employees, including officers, will become fully vested in their accounts and upon repayment in full of stock ownership plan (ESOP) loan balances, unallocated shares of Westborough common stock will be allocated to the employee accounts at the $35.00 per share price. The total amount of this allocation is estimated to be $530,984 of which Mr. MacDonough will receive $64,617, Ms. Bouvier will receive $33,032, and Mr. Casagrande will receive $45,726. Aff. of Joseph Casagrande, para. 20.
Finally, with regard to Westborough’s Supplemental Compensation Agreement with non-employee directors who have not reached the age of 75, benefits for these employees will be fully vested upon comple *116 tion of the merger, but only four directors who will not continue to be employed with the new bank will receive payments totaling $363,618.00 at the time of the merger. Because it is anticipated that nine of Westborough’s Directors will become directors under the new entity, they will not receive any payments under these Supplemental Compensation Agreements. Aff Joseph Casagrande, para. 21-22.

(2) Other terms of the Proposed Merger C‘No Shop” and “Termination Fee”)

In addition to the above financial terms, the Proposed Merger Agreement contains some limitations that are designed to protect Assabet. The “No Shop” provision prohibits Westborough from actively seeking competing bids, but allows Westborough to begin discussions with any bidder which is judged “likely” to offer a “superior proposal” to Assabet. See Agreement and Plan of Merger Section 7.7 found as Exhibit A to Proxy Statement (Aff. Mr. Coney, Ex. 2). The Proposed Merger also required approval by at least 2/3rds of Westborough Financial’s shareholders. Finally, the Proposed Merger Agreement contains a provision requiring Westborough to pay Assabet a flat fee of 5% of the value of the deal in the event of a termination. These terms were reviewed and determined to be fair and reasonable by RBC as well as by Westborough’s Directors.

F. Consideration and Rejection by Westborough of Additional Offers

On or about December 27, 2006, Westborough received an unsolicited offer from Robert T. Williamson, who has described himself as a “professional investor,” and who expressed an interest in acquiring the common stock of Westborough Financial that is not owned by Westborough MHC for the price of $38.50 per share. I credit the statements by Mr. MacDonough that this offer and a subsequent offer by Mr. Williamson was unanimously rejected by the Westborough Board as not likely to lead to a “superior offer” on grounds that it did not involve a complementary financial institution, and because its terms ran counter to the underlying needs that led Westborough to seek a merger partner (e.g., Williamson insisted on continued independent operation of the Westborough bank), and were inconsistent with Massachusetts law (Williamson insisted on control of the Westborough Boards even though Massachusetts law requires a mutual holding company to retain at least 51% voting control of the entity). Aff. Joseph F. MacDonough, para. 32-34.
Westborough also received two other unsolicited proposals from Mark L. Bistricer, on behalf of a group of investors, who also offered to buy the common stock of Westborough Financial that is not owned by Westborough MHC for the price of $40.00 per share (February 28,2007) and then $41.00 per share (March 27, 2007). I credit the statements by Mr. MacDonough that this offer also was unanimously rejected by the Westborough Board as not likely to lead to a “superior offer” on grounds that it sought to maintain the continued, independent operation of the Westborough Bank. However, in order to fully consider Bistricer’s second and higher offer (which did not insist on control of the Board), the Westborough Board sought and obtained from Assabet a limited waiver of the merger agreement to allow for a meeting between the Bistricer group and members of Westborough’s Long Range Planning Committee. This meeting took place on April 30, 2007. Aff. Joseph F. MacDonough, para 35-36.
I credit Mr. MacDonough’s assessment of these offers as follows:
Each of these buyers was interested in acquiring only the 36% publicly-owned shares. Neither buyer was a banking concern in Massachusetts, and neither buyer had any experience running a Massachusetts banking concern. Thus, both buyers were proposing to maintain Westborough Bank as a stand-alone entity, which our Board of Directors did not believe to be in the best interests of the Bank and its customers.
The Board carefully considered these proposals before rejecting them. The Board was generally concerned with the anticipated problems in obtaining regulatory approval for a buyer to acquire 36% of Westborough financial yet take control of the mutual holding company, the lack of any strategic advantage given the buyers’ lack of experience in running a bank and the fact that they were not banks themselves. The Board was also concerned with Williamson’s ability to finance his proposal.
Aff. Joseph F. MacDonough, para. 37-38. See also Aff. James N. Ball, para. 23-28; Aff. Robert A. Klugman, para. 23-32.[10]

IV. DISCUSSION

A. The Standard Governing Judicial Review of the Fiduciary Duty Owed by Westborough’s Board to the Owners of the Public Stock

The general duty owed by a director to the shareholders of a corporation under Massachusetts law is that he or she must discharge the duties of a director “(1) in good faith; (2) with the care that a person in a like position would reasonably believe is appropriate under similar circumstances; and (3) in a manner [the director] believes to be in the best interests of the corporation.” G.L.c. 156D, §8.30(a). The parties in this case have offered radically different views about the appropriate standard of judicial review that should govern this court’s determination whether the Westborough Board of Directors fulfilled its fiduciary duties to its stockholders in pursuing a merger. The plaintiffs maintain that this court should follow an influential Delaware case, Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173, 182 (Del. 1986), which held that “[t]he duty of the board . . . [is] the maximization of the company’s value at a sale for the stockholders’ benefit.” When directors engage in a *117 transaction involving the “cash out” of minority shareholders, as is proposed in this case, the plaintiffs argue that the duty of the directors is simple — "the board must act in a neutral manner to encourage the highest possible price for its shareholders." Barkan v. Amsted Indus., 567 A.2d 1279, 1286 (Del. 1989).[11] The plaintiffs assert that the Directors of Westborough, in particular Mr. MacDonough, violated their fiduciary duties in several ways, but principally by not shopping the bank around in the marketplace to determine the highest price that could be obtained for its shareholders before entering into a single party negotiation, and by securing financial benefits for a limited number of directors that were not extended to the shareholders.[12]
The defendants, on the other hand, maintain that they are entitled to the benefit of the “business judgment rule” whereby “directors are presumed to act in the best interests of the corporation.” See Harhen v. Brown, 431 Mass. 838, 844-45 (2000). See also Seidman v. Cent. Bancorp, Inc., 16 Mass. L. Rptr. 383, 2003 WL 21528509 (Mass.Super. No. 030547 BLS; 030554BLS and 032287BLS 2003). This follows, the defendants say, in part as a result of the “constituency” provision of G.L.c. 156D, §8.30(a)(3), which authorizes a director to take into account the interests of the corporation’s employees and customers, the local, regional and national economy, and the long-term and short-term interests of the shareholders. The remedy for disgruntled minority shareholders, according to the defendants, is to exercise their apprisal rights pursuant to G.L.c. 156B, §98. These two approaches involve substantially different degrees of judicial scrutiny and substantially different methodologies in order to determine whether Directors have honored or breached their fiduciary duties. See, e.g., Cinerama, Inc. v. Technicolor, Inc., 17 Del.Ct.Corp. 551, 1991 WL 111134 (Del.Ct.Ch. 1991) (Chancellor Allen provides a comprehensive analysis explaining the differences between use of the Business Judgment Rule and the Revlon standard).
Neither the Plaintiffs nor the Defendants have presented a wholly satisfactory analytical framework for determining the nature of judicial review of the question whether the Westborough Directors met their fiduciary duties to their stockholders. The Revlon standard, as articulated by the Plaintiffs, is premised on the assumption that the transaction under scrutiny involves the merger of a 100% publicly owned entity. The Defendants correctly explain that in the year 2000, the Westborough Bank transformed itself from a mutual bank in which the ownership lies totally with the depositors into a partially publicly owned bank as a result of the sale of 36% interest to minority stockholders with the majority ownership interest retained by a Massachusetts Mutual Holding Company. It is undisputed that at the time of this transaction in year 2000, as a result of the terms of the Prospectus accompanying the sale of stock, the minority shareholders such as the Plaintiffs were made aware that the Boards of Westborough Financial Services, Inc., a mid-tier holding company of defendant Westboro Bank and its majority owner, Westboro Bancorp, MHC, a chartered mutual holding company, would exercise control over the entities and that their votes might not always have the effect of maximizing the share price of the minority shares. The reason for this is obvious. Since year 2000, the Boards controlling the Westborough entities have had multiple and potentially competing interests to serve — they must consider the interests of depositors, employees, suppliers, creditors, etc. as well as the minority shareholders. See also Defendants’ Memorandum of Law in Opposition to the Plaintiffs’ Motion for a Preliminary Injunction at 30-31.
On the other hand, the Plaintiffs are correct in noting that in a merger involving a “cash-out” of minority shareholders, as in this case, just as in the case of a “freeze-out” in which a controlling stockholder and corporate director chooses to eliminate public ownership, the reasons for the presumption that Directors will act in the best interests of the minority shareholders is lacking and, therefore, greater judicial scrutiny is appropriate.
The business judgment rule allows courts to presume that the board of directors acted in the best interests of the corporation and, therefore, to largely abstain from evaluating the validity of the board’s decisions. Harhen v. Brown, 431 Mass. 838, 865 (2000). However, some transactions involve a higher risk of abuse of fiduciary duty and warrant higher judicial scrutiny. See Coggins v. New England Patriots Football Club, 397 Mass. 525, 533 (1986). The transaction at issue in this case is somewhat analogous to a so-called “freeze-out” merger, where a controlling stockholder and corporate director chooses to eliminate public ownership. “The dangers of self-dealing and abuse of fiduciary duty are greatest in freeze-out situations” like this. Id. at 532. “It is in these cases that a judge should examine with closest scrutiny the motives and the behavior of the controlling stockholder.” Id. at 533.
The Supreme Judicial Court has developed a two-part test in evaluating this type of transactions. “Because the danger of abuse of fiduciary duty is especially great in a freeze-out merger, the court must be satisfied that the freeze-out was for the advancement of a legitimate corporate purpose. If satisfied that elimination of public ownership is in furtherance of a business purpose, the court should then proceed to determine if the transaction was fair by examining the totality of the circumstances.” Coggins, at 534. The burden of showing, first, that the merger was for a legitimate business purpose, and, second, that considering totality of circumstances, it was fair to the minority is on the defendants. Id. at 534, 535.

*118
B. Consideration of Likelihood of Success on the Merits

The approach suggested by the Supreme Judicial Court in Coggins, supra, must be applied in the context of the traditional test for determining whether to issue a preliminary injunction. The first consideration is whether the Plaintiffs have demonstrated a reasonable likelihood of success.

(1) Business Purpose Test

The record before the Court is compelling (and Plaintiffs do not seriously dispute) that Westborough’s merger with Assabet serves a legitimate business purpose. Westborough was experiencing a decline in performance in 2004 and 2005, it lost money in fiscal year 2006, and there are grave concerns about its future performance as an independent bank. The record also shows that the board directors came to the conclusion that to improve Westborough’s position, it was necessary to merge the bank with another financial institution. It is also undisputed that Assabet’s current business structure mandates elimination of public ownership of Westborough in order to complete the merger. Thus, this Court is satisfied, based on the record available at this stage of the proceedings, that the merger at issue here will serve a legitimate business purpose.

(2) Fairness Under the Totality of the Circumstances

“The concept of fairness has two aspects: fair dealing and fair price.” Coggins at 531, citing Weinberger v. UOP, Inc., 457 A.2d 701, 711 (Del. 1983). Plaintiffs claim that the process of negotiations employed by Defendants in reaching the merger agreement with Assabet was unfair because Westborough chose to negotiate with only one potential partner. The Court disagrees. The above facts show that the Westborough Board gave careful consideration to the issue of whether to negotiate with multiple parties at the same time or focus on one, most compatible in their view, partner. They hired independent financial and legal consultants who outlined pros and cons of each approach for the Board. The Board’s decision to concentrate their efforts on securing a deal with one partner, whom they identified as the most desirable, was made only after a thorough evaluation and ranking of seven potential partners, [13] an articulation of reasons for the choice, and in light of an independent assessment of what price should be paid by a merger partner for each share of publicly owned stock.[14] The plaintiffs rely on a recent Delaware case to support their contention that the Westborough Board did not fully inform itself of the merger possibilities before entering into a one-party negotiation. However, the authorityin question is distinguishable in several important respects. Contrast, In re Prime Hospitality, Inc., 2005 WL 1138738, Civ. Action A-652-N (Del. Ch. 2005) (first, application of the Revlon standard was interpreted by the court to require the directors to assume “the sole responsibility of maximizing shareholder value”; and second, the record contained little, if any evidence, that the directors had received unbiased financial advice or done any meaningful market check before approving an acquisition by another entity). Thus, I conclude that the defendants have demonstrated on the basis of the evidence before me that the decision to pursue a one-party negotiation was reasonable under the circumstances and that the process utilized by the Westborough Board was fair. There is simply no evidence in this record that a compatible and complementary banking partner exists which is willing to pay Westborough’s stockholders more than $35 per share.
In terms of the Plaintiffs’ allegation that the Westborough Directors engaged in self-dealing and were conflicted and that they put their own personal interests ahead of the interests of the shareholders, the record does not support their claim. Even if the effect of applying a Coggins-type analysis is to place the burden of demonstrating fairness and reasonableness on the shoulders of the Westborough Directors in a cash-out merger transaction such as this, it is my view that they have met their burden. Thus, mindful of the Plaintiffs’ obligation to demonstrate a likelihood of success on a motion for a preliminary injunction, the burden shifts to them to rebut the defendants’ evidence and establish that in fact the Westborough Directors were conflicted and engaged in self-dealing. I do not believe the Plaintiffs have carried their burden.
For the reasons stated above, in the negotiation with Assabet, Mr. MacDonough had a duty to consider not only the price to be paid to minority shareholders as a result of a merger, but other interests such as the importance of continuing to serve Westborough’s customers and local and regional economic and community interests. See 12 U.S.C., §§1842(c)(2) & 2901(a)(3); G.L.c. 167, §14; G.L. 156D, 8.30(a)(3). It was legitimate for Mr. MacDonough to pursue merger terms that would result in his continued involvement as a member of the Board of the new entity along with the involvement of other Westborough Directors so long as this goal was not achieved at the expense of achieving fairness in terms of the price per share to be paid to the minority shareholders. Since the negotiation process inevitably places these goals in competition with each other as central bargaining points in any proposed merger agreement, Mr. MacDonough could not fulfill his fiduciary duties by attempting to maximize either goal, i.e., by simply trying to obtain merger terms whereby Westborough would obtain as close to a controlling interest in the new entity as possible by securing a seat for every current Westborough Director on the new Board regardless of the price to be paid for each share of Westborough common stock, or, conversely, by simply trying to obtain the highest possible offer for Westborough’s common stock without regard for the impact on Westborough’s customers or the local community and the region.
*119 The plaintiffs have vastly overstated and incorrectly characterized the financial terms and adjustments set forth in the Proposed Merger Agreement with respect to Mr. MacDonough, Mr. Casagrande and the other Westborough Directors. With the exception of the SERP plans, the above facts indicate that Mr. MacD-onough and Mr. Casagrande will receive a lower net amount of compensation as a result of the merger than they would have received under preexisting employment and benefit agreements each of them had with Westborough. While the accelerated payment of SERP benefits, discounted for present value, and the tax adjustments are undoubtedly benefits that will be received by Mr. MacDonough, Mr. Casagrande and Ms. Bouvier, some resolution of these matters was unavoidable, i.e., a merger could not be completed without addressing the change in control features of the preexisting employment and benefits agreements that Westborough Directors had secured prior to 2005. Moreover, none of the benefits that were negotiated for certain Westborough Directors under the merger agreement are independent of and unrelated to benefit provisions they enjoyed under preexisting contracts with Westborough. Contrast Demoulas v. Demoulas Supermarkets, Inc., 424 Mass. 501, 531-44 (1997) (Directors violated their fiduciary duties by self-dealing). I do not regard these adjustments as unreasonable or unfair and do not find any evidence that they adversely affected the ultimate question of what price per share would be paid by Assabet for Westborough’s common stock.[15] A Director participating in a merger negotiation such as the one involved in this case does not engage in self-dealing and become conflicted simply because he or she negotiates terms of his own compensation and that of other fellow Board members in the new entiiy when (1) the continued participation of the Director is in the best interests of the merging corporation, (2) the terms of his own compensation represent the translation of terms and benefits under preexisting employment and benefit agreements with the merging corporation into present cash value, and (3) these terms are fully disclosed to the Board prior to its approval of the merger. See Cinerama, Inc., supra, 1991 WL at *12-*15. See Defendants’ Memorandum of Law at 26-28, and cases cited.
Plaintiffs further contend that inclusion of the “no shop” provision and termination fee in the merger agreement created a fairness concern. The affidavits establish that such provisions are customarily included in agreements of this nature. Case law indicates that so-called “No Talk/No Shop” clauses and termination fees are not uncommon in merger agreements. See, e.g., In re Guidant Corp. Shareholders Deriv. Litig., 2006 WL 2900524 *10-*13 (S.D.Ind. 2005). It is significant that the independent financial consulting firm hired by Westborough, RBC, concluded that the terms of “no shop” clause and the amount of the termination fee were reasonable. See id., 2006 WL at 290524 *10. It was not unreasonable for the Westborough Board to rely on their recommendation. There is no evidence here that these features of the Proposed Merger Agreement were used by Westborough or otherwise served to dissuade others who had an interest in competing for a merger opportunity with Westborough. While Plaintiffs have cited cases that suggest that termination fees in the range of 3.5 to 5% are regarded as high, no authority has been brought to my attention that indicates per se rule should be applied that a proposed merger agreement is unfair and unreasonable because it contains a termination fee of 5%.
Plaintiffs’ only remaining point of contention is the per share price of $35 that they would receive as the result of the merger. The price negotiated for the publicly owned shares appears to be at the top of the range indicated by RBC as reasonable. Record further establishes that Assabet hired its own independent consultant, who also determined a $35/share price to be fair. In addition, the cash-out price is significantly higher than the trading price of the Westborough stock on the open market on the day prior to public announcement of the merger agreement. Thus, under the totality of the circumstances, the transaction appears to be fair to both the majority and minority shareholders.
Therefore, Plaintiffs failed to show that they are likely to succeed on the merits and are not entitled to a preliminary injunction.
C. Balance of the Harms
In light of the conclusion above, it is not necessary to determine whether Plaintiffs would suffer irreparable harm if the injunction were not granted. Nevertheless, even presuming that the difficulty of ascertaining the exact per share price Plaintiffs could receive if Westborough were to merge with a different partner presents the irreparable harm, the balance of harms does not cut in Plaintiffs’ favor. In view of the fact that Assabet may walk away from the merger and no other partners expressed any interest in merging with Westborough, Defendants stand to loose a valuable and, possibly, their only opportunity to merge with a strong strategic partner. This harm may be veiy difficult, if not impossible, to rectify later should the defendants eventually prevail at trial. There is a basis for the genuine concern expressed by a number of the Westborough Directors that the bank will not remain viable as an independent bank. Considered in light of the court’s conclusion that Plaintiffs have not established a likelihood of their success on the merits, it would be inappropriate to issue a preliminary injunction in this case.

ORDER

A preliminary injunction is an extraordinary remedy, and the party which seeks such relief must shoulder the burden of establishing a likelihood of success, the prospect of irreparable harm without the *120 relief, and that the balance of harms weighs in favor of granting it relief. Issuance of an injunction in this case could jeopardize the only opportunity for the Westborough Bank to achieve a merger that not only is fair and reasonable to its shareholders, but that meets the needs of its customers and the community. The failure to issue an injunction, on the other hand, does not foreclose a remedy if the Plaintiffs succeed in the underlying case. For the above reasons, the Plaintiffs’ Motion for a Preliminaiy Injunction is hereby DENIED.

For convenience, throughout this decision the three entities which are defendants will be referred to as “Westboro” unless a specific reference to one particular entity is required.

See plaintiffs Verified Complaint, paragraph (1). “The merger agreement involves what is known as a ‘remutualization transaction.’ In a remutualization transaction, no payment is made for the disappearing mutual institution because there are no shareholders of a mutual institution. Thus, no payment will be made for the shares of Westborough Financial that are owned by Westborough MHC.” Affidavit of Joseph F. MacDonough, para. 26.

The presentation in its entirety is part of the record before me and can be found as exhibit one to the affidavit of Richard Quad.

I also credit Mr. Ball’s detailed explanation of the specific factors considered by the Westboro Board that led it to conclude that Assabet was the strongest potential partner for a merger. See Aff. Of James Ball, para. 14 (discussing factors including “Complementary Services”; “Size”; “Asset and Liability Mix”; “Community Orientation"; and “Geography”).

There is evidence in the record that the directors and officers of the Westboro Bank were aware in late 2005 of projections that the bank would lose money in 2006 and absent a merger would not become profitable again. “Indeed the Bank has suffered a net loss for fiscal year 2006.” See Aff. Of Robert Klugman, para. 7. Also, I credit the observation by Mr. Quad that “[t]he $35.00 per share offered by Assabet is at the top of the range of values that I expected Westborough Financial would be able to obtain for its public shares when I conducted my initial analysis in November of 2005. Since that point, the overall market has been stagnant if not in decline and Westborough’s financial condition has only gotten worse.” Aff. Richard Quad, para. 27.

Sometime prior to this, the Chairman of Westborough’s Board raised the question whether the Board could consider a lower price for its publicly owned shares in exchange for a greater number of seats on the new Board. The immediate response from Mr. Quad was that this idea was unacceptable and the issue was not raised again. Aff. Richard Quad, para. 20.

The updated “fairness opinion” supplied by RBC and dated November 13, 2006 is set forth as exhibit 2 to the affidavit by Richard Quad.

In particular, this change of control provision will result in apayment to Mr. MacDonough of approximately $243,723; to Ms. Bouvier of $436,478; and to Mr. Casagrande of $166,108. If each of these individuals worked to age 65 and received annual salary and bonus increases of 5%, they would be entitled at that future date to SERP payments of $1,173,261 (Mr. MacDonough); $597,040 (Ms. Bouvier); and $711,589 (Mr. Casagrande). See Aff. Joseph Casagrande, para. 17-18. Since the SERP obligations are to be handled as lump sum payments, the new entity will avoid the obligation to carry (hem as accruing debts on its books to be paid at a future date. As Mr. Casagrande put it, “it is an early payout of money to which we would be entitled if the SERP were honored by any merger partner involving a change of control, at a calculation designed to discount the estimated future benefits to take into consideration the time value of money . . . [T]hese payments have no overall adverse economic impact on the company.” Aff. Joseph Casagrande, para. 16, 19.

Mr. Klugman indicates that both Mr. Williamson and Mr. Bistricer, who together reportedly owned or controlled approximately 40% of the publicly held shares of Westborough, were interested in completing a “full stock conversion or second-step transaction. Messrs. Williamson and Bistricer both wished to ignore the fact that a full stock conversion would be a poor strategic decision for the bank as a business because the Bank was already overcapitalized.” Also, Mr. Klugman asserts that Mr. Bistricer acknowledged that he offered up to $41.00 per share because “he possessed other investments that would suffer if the transaction were to be completed at $35.00, and he was willing to make the acquisition himself to support his other investment positions.” Aff. Klugman, para. 29, 30.

As Plaintiffs counsel, attorney DeValerio, explained it at oral argument, applying the Revlon test to the facts of this case means that the directors of Westborough were under a duty to act as “auctioneers” — to simply ensure the highest possible value for the stock owned by Westborough’s shareholders.

In one important respect, Plaintiffs’ counsel misstated the facts during his argument when he maintained that the Westborough Directors did not reassess the fairness of the $30-$35 price range estimated by RBC as fair value for the Westborough stock in November 2005. The record clearly shows that RBC obtained an updated fairness opinion from RBC on November 13, 2006 indicating that the per share merger consideration of $35. per share to be paid by Assabet “is fair, from a financial point of view, to the public shareholders of the Company.” Aff. Richard Quad, exh. 2.

Plaintiffs rely on deposition testimony of several Westborough Directors in which they concede that they might have learned more about the strengths and weaknesses of the other banks who were potential merger partners if they had shopped Westborough bank around before beginning a negotiation with Assabet. See Plaintiffs Reply Brief at 9. However, Plaintiffs overlook the compelling reasons given by Westborough Board members for moving ahead once they had done the initial ranking and identified Assabet as the best candidate. There were legitimate risks that engaging in what would likely be a lengthier process of shopping the bank around could put the prospects for a successful merger in question due to Westborough’s declining performance.

The Plaintiffs concede that even under the Revlon standard, it is not necessarily unfair or unreasonable for Directors to pursue a single-party negotiation instead of first shopping the company around.

Likewise, the payment by Westborough of a $250,000 “bonus” to Mr. MacDonough for his work during 2006 relating to the merger negotiations is not unreasonable or unfair on its face. The fact that he received no bonus in 2004 and only a $6,000 bonus in 2005 is of no consequence whatsoever.